2006-NMCA-130

160 P.3d 902

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Mark Joseph LIZZOL, Defendant–Appellant.**

**No. 25,794.**

Court of Appeals of New Mexico.

Aug. 28, 2006.

Certiorari Granted, No. 30,019, Oct. 12, 2006.

As Revised Oct. 23, 2006.

Patricia A. Madrid, Attorney General, Santa Fe, NM, Jacqueline R. Medina, Assistant Attorney General, Albuquerque, NM, for Appellee.

John Bigelow, Chief Public Defender, Santa Fe, NM, Meg Bailey, Assistant Appellate Defender, Albuquerque, NM, for Appellant.

## OPINION

BUSTAMANTE, Chief Judge.

{1} Defendant Mark Joseph Lizzol appeals from a district court order which reversed a metropolitan court order suppressing evidence and dismissing his case. The district court remanded the case to metropolitan court for trial on the charges of driving while under the influence of intoxicating liquor (DWI) and operating a vehicle with no taillights. Defendant appeals the order on grounds that (1) double jeopardy barred the State's appeal to district court because the metropolitan court's ruling constituted an acquittal, (2) the State had no right to appeal the metropolitan court suppression order under *State v. Heinsen,* 2004–NMCA–110, 136 N.M. 295, 97 P.3d 627, and (3) the metropolitan court judge properly suppressed the breath alcohol test (BAT) card because the State failed to lay a proper foundation for its admission. Concluding that the metropolitan court order was a final judgment, we hold that the State could prosecute its appeal to the district court under NMSA 1978, § 34–8A–6(C) (1993). In the particular context of this case, we hold that double jeopardy principles do not bar the State's appeal. Finally, we determine that the metropolitan court order excluding the BAT was correct, and we therefore reverse the district court's ruling.

## FACTS AND PROCEEDINGS

{2} Defendant was charged with "Driving While Intoxicated," and "Defective Equipment" by a criminal complaint filed in metropolitan court. The State's first and only witness at the nonjury trial, Officer Tanner Tixier, testified about the stop, his interaction with Defendant after the stop, his decision to administer a breath test, and his subsequent arrest of Defendant for DWI.

{3} With regard to the stop, the officer stated that at approximately 1:59 a.m., while traveling eastbound on Central he noticed Mr. Lizzol's vehicle traveling westbound on Central without taillights. Because the lack of taillights presented a safety issue, the officer made a U-turn and caught up with Lizzol's vehicle. When the officer engaged his emergency lights, Lizzol immediately pulled out of traffic into Duran's Pharmacy. On cross-examination the officer stated it took about five seconds to make a U-turn, and about another three seconds for him to pull over. Officer Tixier observed no moving violations, no failure to maintain lanes, and no speeding by Lizzol. The officer observed signs of intoxication: extremely watery eyes and a strong odor of alcohol coming from the facial area and expelled breath. The officer

asked if Lizzol had had anything to drink. Lizzol replied that he had a few beers. The Officer asked him to get out of the vehicle to do standardized field sobriety tests. On cross-examination Officer Tixier conceded that as he walked up to the driver's side of Lizzol's car, Lizzol waited, did not exit the car until asked to, and did not fumble while getting his documents. Lizzol opened the door and exited. The officer stated that Lizzol leaned on the car door to get out, but didn't have any concerns of him falling and he did not trip, stagger, or stumble. The defense counsel stipulated that the officer had probable cause to arrest Defendant.

{4} During the State's examination concerning administration of the breath test, the prosecutor asked the officer how he knew that the machine was certified. The officer began to testify that "there is a small certificate that is posted on the machine itself stating that," but was interrupted by defense counsel's objection on grounds of hearsay, lack of foundation, and the best evidence rule. After hearing the State's argument in response, the judge allowed the testimony, noting defense counsel's ongoing objection.

{5} The officer continued to testify about his experience conducting breath tests on the machine, the way he conducted Defendant's breath test, and the different ways the machine indicated it was working properly. The officer identified State's Exhibit A as the BAT card containing Defendant's results, and testified that he signed it. When the State moved to admit the BAT card, defense counsel objected. The judge reserved ruling until such time as defense counsel could voir dire the witness as part of his cross-examination.

{6} On cross examination, the officer acknowledged that he did not work for the scientific laboratory division of the department of health (SLD), and that he was not an SLD key operator. Officer Tixier also conceded that he had no personal knowledge or recollection of standards, maintenance, or calibration for the Intoxilyzer 5000. He could not state the last time the key operator ran maintenance on the machine. He did not know who prepared the simulator solution or when it was prepared. He was not familiar

with the simulator itself. He was not familiar with the certification of the thermometer. He was not familiar with the internal diagnostic functions of the machine—including the hardware and software functions performed. He did not know what the machine was checking during the diagnostic. Neither was he familiar with the calibrations, standards, nor proficiency tests that were to be performed on the machine at regular intervals. When defense counsel asked Officer Tixier if he was familiar with the site approval for the location of the machine, Officer Tixier testified that he had no idea. He further conceded that he did not know if the Prisoner Transport Center was an approved site for using the Intoxilyzer 5000.

{7} With regard to the "certification card" referred to in his direct testimony, the officer revealed that it was a replica of an actual certificate, shrunk down to size. He did not know who put it on the machine or who signed it. He admitted having no personal knowledge with regard to that certification. He stated that he was not familiar with the weekly, monthly, bi-monthly, quarterly, semi-annual, or annual standards and calibrations, or other proficiency types of testing performed on the Intoxilyzer 5000.

{8} After a short redirect examination of the officer, the State again moved to admit the BAT card, and defense counsel again objected. Following argument by counsel, the judge narrowed the issue to whether the officer was an appropriately qualified witness under *Garza v. State Taxation & Revenue Department,* 2004–NMCA–061, ¶ 15, 135 N.M. 673, 92 P.3d 685. After considerable argument from counsel and defense counsel's further voir dire of the officer, the judge expressed his frustration with the issue raised by defense counsel and questioned whether he could certify the issue for interlocutory appeal. Both counsel agreed that this was not an option. The judge stated that someone had to take the issue up for review because there was "just no other way to do this," and indicated that he would enter a final order. The judge continued, stating that he thought the issue could go either way depending upon the meaning of an appropri-

ately qualified witness under *Garza.* He stated:

> I sure would like to find the answer to that and I'm not saying I necessarily believe it one way or the other. I am just saying right now its (sic) too close to call, and if its (sic) going to be that way I'm going to find reasonable doubt in all of this stuff so I'll go ahead and find that the officer in this case was not the proper person to be [an] appropriately qualified witness by certification and as such I'll suppress the breath test.... I'm gonna find that I had reasonable doubt in the case based on that, I'm assuming the State rests after this.

The State agreed it would rest. Further, the State did not argue that it had sufficient evidence for a conviction absent the BAT results. The judge concluded: "So I find that I had reasonable doubt based on that, and as such would find the Defendant not guilty at this point and that we'll just leave it as such." Counsel asked for a final order and the judge stated that he would have one ready in the morning so the State could appeal. The judge thanked the parties for their arguments and the trial was ended. The written order states: "The breath card is suppressed because the officer is found not to be '[a] qualified individual' to testify to the certification of the breath machine under ... *Garza,* the case is therefore dismissed."

{9} The State appealed the dismissal to the district court. The only issues it argued on appeal to the district court involved the refusal of the metropolitan court to admit the BAT results.

## The District Court's Jurisdiction to Consider the State's Appeal

{10} As we note in the introductory paragraphs of this Opinion, Defendant's first two points on appeal question the authority of the district court to entertain the State's appeal. We address the applicability of the holding in *Heinsen* first and then turn to the finality and double jeopardy issues.

{11} Defendant argues that under *Heinsen,* the State cannot appeal from a metropolitan court suppression order. The State argues that it has a right to appeal an erroneous metropolitan court order suppressing

evidence in a DWI case pursuant to Section 34–8A–6(C). We review the application and interpretation of constitutional provisions, statutes, and court rules de novo to determine whether the State has a right to an appeal and to measure the scope of the appeal allowed. *See State v. Gage,* 2002–NMCA–018, ¶ 14, 131 N.M. 581, 40 P.3d 1025.

{12} *Heinsen* began life as two separate magistrate court actions. The defendant in each case filed a successful pretrial motion to suppress evidence. The State filed an immediate appeal to the district court in each case. In *Heinsen,* the district court quashed the notice of appeal; in the other, the district court held a de novo hearing on the motion to suppress and denied it. 2004–NMCA–110, ¶¶ 4, 6, 136 N.M. 295, 97 P.3d 627. Following precedent, we held that no provision of our constitution, statute, or rules of procedure permitted an immediate interlocutory appeal of a magistrate court order suppressing evidence. *Id.* ¶¶ 1, 27. Rather, we emphasized that the constitution and rules explicitly require a final judgment before an appeal from a magistrate court will lie. *Id.* ¶¶ 6, 7. We noted—generally—that suppression orders "are interlocutory and not final orders." *Id.* ¶ 15. We did recognize that the State may appeal from orders of dismissal so long as the order is final. *Id.* ¶ 16; *State v. Giraudo,* 99 N.M. 634, 637, 661 P.2d 1333, 1336 (Ct. App.1983).

{13} Seizing on the language in *Heinsen* that suppression orders are interlocutory rulings, Defendant urges us to apply *Heinsen* wholesale to appeals from the metropolitan court. If the procedural posture here was the same as we examined in *Heinsen*—that is, on appeal from a pretrial suppression decision—we would readily agree. As in *Heinsen,* there are no provisions allowing interlocutory appeals from metropolitan court to district court. And, contrary to the State's argument, the amendments to Section 34–8A–6(C) enacted subsequent to our decision in *Giraudo,* do not affect the analysis with regard to the finality requirement. The 1993 amendment changed the word "person" in the statute to "party," thus making clear that the State has a statutory right to appeal

from metropolitan court judgments involving DWI and domestic violence offenses. The amendment did not alter, however, the requirement that appeals be from "judgments." *See id.* In *Heinsen,* we essentially equated "judgments" with "final orders." The legislature thus has not created a metropolitan court version of NMSA 1978, § 39–3–3(B)(2) (1972), which explicitly allows interlocutory appeals from district court orders suppressing or excluding evidence.

{14} However, there are salient procedural and statutory differences in this case which counsel a different analysis and different result than *Heinsen.* First, the order in this case is on its face an order of dismissal, not an interlocutory order simply addressing a pretrial motion. Upon entry of the order, the metropolitan court proceeding was at an end. In *Heinsen,* the orders appealed from left the cases pending in magistrate court, albeit with limited evidentiary options available to the State at trials yet to be held. 2004–NMCA–110, ¶¶ 23–24, 136 N.M. 295, 97 P.3d 627.

{15} Second, under Section 34–8A–6(C), although constituted as a magistrate court, metropolitan court is a court of record for "criminal actions involving driving while under the influence of intoxicating liquors or drugs." Appeals from metropolitan court in cases involving DWI are thus on the record and not de novo. *See generally,* Rule 7–703 NMRA. As a consequence, the State's only recourse from a dismissal order entered by the metropolitan court in a DWI case is by appeal. The State may file a voluntary nolle prosequi of a case prior to commencement of trial, but once a trial has begun, it can seek review only by appeal on the record.[1]

{16} These two factors make this a different case than *Heinsen.* The procedural posture of this case is analogous to that which we would face if the charges had been filed in the district court and the State appealed a dismissal to us under the authority of Section 39–3–3(B)(1). There is little doubt we would entertain an appeal from a district court order raising the same issue, assuming we determined the order appealed from was final and did not offend double jeopardy principles. *State v. Joe,* 2003–NMCA–071, ¶ 17, 133 N.M. 741, 69 P.3d 251 (affirming district court's suppression order issued mid-trial); *State v. Romero,* 2000–NMCA–029, ¶ 9, 128 N.M. 806, 999 P.2d 1038 (allowing State to appeal a trial court ruling forbidding the State to elicit certain testimony from one of its witnesses). We see no reason to treat this appeal differently. In doing so, we acknowledge we are treating Section 34–8A–6(C) as the metropolitan court equivalent of Section 39–3–3(B)(1).

## The Order Was Final

{17} Viewing the case from that perspective, we turn to the issues of finality and double jeopardy. Generally, "[a] final order is one that disposes of the case or effectively concludes it by court action." *Heinsen,* 2004–NMCA–110, ¶ 16, 136 N.M. 295, 97 P.3d 627. The metropolitan court order meets this standard. Unlike the situation in *Heinsen,* upon entry of the order here, there was nothing left before the metropolitan court to deal with. The order on its face dismissed the DWI charge and the vehicle equipment violation charge. The order is final in every substantive sense of the word in that there was nothing left for the metropolitan court to do. *Kelly Inn No. 102, Inc. v. Kapnison,* 113 N.M. 231, 236, 824 P.2d 1033, 1038 (1992) (noting that an order "is not considered final unless all issues of law and fact have been determined and the case disposed of by the trial court to the fullest extent possible" (internal quotation marks and citation omitted)).

## Double Jeopardy Does Not Bar Appeal

{18} Defendant argues that double jeopardy also barred the district court from considering the State's appeal. The type of protection Defendant seeks from the double jeopardy clause is the "protection against a second prosecution for the same offense after an acquittal." *State v. Vaughn,* 2005–NMCA–076, ¶ 8, 137 N.M. 674, 114 P.3d 354. The core meaning of the double jeopardy

---

1. In rare circumstances, resort to one of the extraordinary writs might be available. No one has argued that such circumstances are present here.

clause of the constitution requires that " '[a] judgment of acquittal, whether based on a jury verdict of not guilty or on a ruling by the court that the evidence is insufficient to convict, may not be appealed and terminates the prosecution when a second trial would be necessitated by a reversal.' " *State v. Archuleta*, 112 N.M. 55, 58, 811 P.2d 88, 91 (Ct.App.1991) (citation omitted).

{19} Defendant argues that the judge's ruling and dismissal of the case constituted an acquittal. Defendant asserts that the BAT results were required to prove an essential element of the charge that Defendant had an alcohol concentration of eight one hundredths or more in his breath. *See* NMSA 1978, § 66–8–102(C)(1) (2004). He further asserts that at the time of the suppression ruling, the State had essentially presented its case, and the judge had heard all the evidence for the DWI charge. Defendant argues that without the BAT results, the State had insufficient evidence to prove the essential element of an elevated breath alcohol level. Consequently, he contends that the judge's ruling was essentially a determination that the exclusion of the BAT results left the State without sufficient proof to convict Defendant of the DWI charge, and that this constituted an adjudication of his innocence. Defendant also asserts that the judge's oral comments that he had "reasonable doubt" and that he found Defendant "not guilty" further indicate that the judge deliberated on the merits of the case and acquitted Defendant of the DWI charge. Defendant does not, however, argue that the judge expressly ruled that Defendant was acquitted of the charges, nor would the record support such an assertion. *See County of Los Alamos v. Tapia*, 109 N.M. 736, 741, 790 P.2d 1017, 1022 (1990) (recognizing that an actual, express judgment of acquittal precludes retrial, regardless of any defects in the process leading to the judgment).

{20} The State concedes that jeopardy attached during the metropolitan court bench trial, but argues that in these circumstances no judgment of acquittal was entered. The State relies on *Vaughn* for the general rule "that an oral ruling by a trial court is not final and, with only limited exceptions, it is not binding." 2005–NMCA–076, ¶ 15, 137 N.M. 674, 114 P.3d 354. Neither of the two limited exceptions recognized in New Mexico apply here. *See id.* (identifying the limited exceptions as the oral declaration of a mistrial and the oral granting of a new trial). Nevertheless, "what constitutes an acquittal 'is not to be controlled by the form of the judge's action. Rather, we must determine whether the ruling of the judge, whatever its label, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged.' " *Id.* ¶ 9 (quoting *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571–72, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977)).

{21} We must decide whether the dismissal order constitutes an acquittal or whether it is an instance of "trial error." If it is the former, double jeopardy principles preclude the State's appeal; if it is the latter, they do not. In short, should this case be controlled by *Archuleta* or by *Tapia?*

{22} The defendant in *Archuleta* was charged with embezzlement and larceny over $250 and conspiracy to commit both of the crimes. 112 N.M. at 56, 811 P.2d at 89. In a series of relatively routine evidentiary rulings during trial, the district court excluded certain testimony and evidence which the State offered in support of the value of the things embezzled or stolen. *Id.* at 57, 811 P.2d at 90. The district court determined that the State had no proof that the goods exceeded $250 and dismissed the case with prejudice rather than let it go to the jury as a misdemeanor. *Id.* at 58–59, 811 P.2d at 91–92.

{23} Interpreting the ruling as a determination by the judge that the State would not be able to present a prima facie case, we viewed the dismissal as a determination of the defendant's factual innocence. We affirmed even though the trial court's "ruling arguably was unreasonable and dismissal of the misdemeanor charges constituted an abuse of discretion." *Id.* at 58, 811 P.2d at 91. We held that the State did not even have a right to appeal, noting that "[r]egardless of the propriety of the district court's evidentiary ruling, it cannot be appealed if it amounts

to an adjudication of defendants' innocence." *Id.*

{24} The attractiveness of this approach to Defendant is obvious and there are attributes of the record which support applying it. Of particular note is the metropolitan court judge's oral statements at the end of trial that absent the BAT results he would have reasonable doubt concerning Defendant's guilt. Also, it is inescapable that the case was dismissed at the close of the State's case. On the other hand, the parties and the judge clearly contemplated further proceedings in metropolitan court if the evidentiary issue concerning the BAT card was resolved in the State's favor on appeal. The trial was terminated and the case dismissed for the purpose of allowing an appeal. The order of dismissal did not include an explicit finding of factual innocence; it simply did not address the issue. It would be anomalous in this case to infer an intent on the part of the metropolitan court judge to file an unappealable order. These cross currents in the record lead us to conclude that this case is closer to *Tapia* than *Archuleta.*

{25} *Tapia* addressed the double jeopardy implications of a trial stopped before completion—that is, before acquittal or conviction by a fact-finder—as the result of a trial court ruling. As our Supreme Court noted, "sometimes, depending on the reasons for the trial court's aborting the trial, double jeopardy will preclude a retrial; sometimes it will not." 109 N.M. at 737, 790 P.2d at 1018. In *Tapia,* the district court suppressed all evidence after it ruled that the arresting officer did not have the statutory authority to pursue a suspect from one county to another. *Id.* at 745, 790 P.2d at 1026. The district court felt that the arrest was illegal and, as a result, it deemed all of the evidence in the case the fruit of the illegal arrest. *Id.* at 738, 790 P.2d at 1019. The State appealed the district court's ruling, and while the appeal was pending, the Supreme Court ruled in a different case that the district court's interpretation of the applicable statute was incorrect. *See Inc. County of Los Alamos v. Johnson,* 108 N.M. 633, 776 P.2d 1252 (1989). Despite the holding in *Johnson,* we upheld the dismissal in *Tapia's* case, treating it as any

other acquittal caused by the State's failure to meet its burden of proof. *Tapia,* 109 N.M. at 738, 790 P.2d at 1019.

{26} The Supreme Court reversed our decision, disagreeing with the idea that the district court's ruling excluding all evidence—and the subsequent dismissal—should be treated as a decision on the quantum of proof offered by the State. *Id.* In the Supreme Court's view, the district court's refusal to accept evidence as a result of its ruling on the basic legality of the arrest could not be deemed a determination of the facts in the case. *Id.* at 739, 790 P.2d at 1020.

{27} Relying primarily on *United States v. Scott,* 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978) for its decision, the Supreme Court held that reversal of a ruling involving a question of law which affected the admission of evidence did not offend double jeopardy. Though clearly wary of characterization and labels, the Supreme Court called this kind of mistake—among others—"trial error." *Tapia,* 109 N.M. at 739–40, 790 P.2d at 1020–21. *Tapia* describes "trial error" as a situation where the "trial has been aborted by a trial court ruling favorable to the defendant ... but no judgment of acquittal has been entered." *Id.* at 744, 790 P.2d at 1025. The Supreme Court suggests that in these cases "at least where the government has not been responsible for the error and has not sought termination of the trial, the defendant's interest in ridding himself or herself of the evils attendant upon another trial may be subordinated to society's interest in the correct application of its laws." *Id. Tapia* suggests factors which may be taken into account in deciding whether retrial is acceptable in such cases. For example, courts should consider the timing of defendants' motions. A defendant who waits until jeopardy attaches, even though the motion could have been filed before trial, will have a weaker interest in avoiding a retrial. *Id.* Courts should also assess whether the State is simply honing its trial strategies or attempting to supply additional evidence through successive proceedings. *Id.* The utility of such amorphous guidelines is suspect at best, and cases such

as this one test our ability to apply them in a predictable, consistent manner.

{28} Our case is distinguishable from *Tapia* in that we are not reviewing a district court's interpretation of a statute. Rather, we are faced with a more direct evidentiary question: what are the foundational requirements for admission of a BAT result, specifically proof that the breath alcohol testing machine was properly certified pursuant to SLD regulations? This difference does not make *Tapia* irrelevant to our inquiry because in its extended discussion, the Supreme Court was careful to include the "incorrect receipt or rejection of evidence" as an example of potential "trial error." *Id.* at 740, 790 P.2d at 1021 (quoting *Burks v. United States*, 437 U.S. 1, 15, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) (internal quotation marks omitted)). The inclusion of evidentiary rulings as examples of "trial error" is vexing. First, this statement is at odds to some degree with the notion that the State normally cannot appeal an evidentiary ruling if it amounts to an adjudication of the facts in a case. And, second, citation to *Burks* is puzzling in that it was an appeal by a defendant, not the government. The issues a defendant may raise on appeal are not limited or burdened by double jeopardy considerations. *Sanabria v. United States*, 437 U.S. 54, 55, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978); *Archuleta*, 112 N.M. at 58, 811 P.2d at 91. Thus, we would be tempted to disregard as a simple oversight *Tapia's* reference to evidentiary rulings as a kind of "trial error" subject to appeal by the State. However, the Supreme Court clearly opted to include such rulings in the concept of "trial error" and we are bound by clear Supreme Court authority. *Alexander v. Delgado*, 84 N.M. 717, 718, 507 P.2d 778, 779 (1973).

{29} We need not explore the outer limits of this language here. For our purposes, it is enough to say that a trial court's refusal to accept evidence not merely for lack of a proper foundation (a routine evidentiary issue), but because it is unclear what the law requires to establish a foundation fits comfortably within the rubric of "trial error." [2] As described in *Tapia*, the difficulty the metropolitan court faced was an uncertainty about the applicable rule of evidence; that is, what does the law require in order to lay a proper foundation for introduction of a BAT result. In short, we hold that the metropolitan court's evidentiary ruling is appealable and is not precluded by double jeopardy. We now turn to the merits of the evidentiary ruling.

## Exclusion of the BAT Card

{30} In *State v. Onsurez*, 2002–NMCA–082, ¶ 13, 132 N.M. 485, 51 P.3d 528, we held that if a "defendant properly preserves the objection, the State must show that the machine used for administering a breath test has been certified by SLD." Because the defendant in *Onsurez* had not preserved the issue, we did not explore what kind of showing the State would be required to make to prove certification. We later addressed this foundational issue in the context of an administrative license revocation hearing. *Garza*, 2004–NMCA–061, 135 N.M. 673, 92 P.3d 685. In *Garza*, we held that "the State could satisfy its threshold showing by affidavit, certification by an appropriately qualified witness, or proof of annual certification records." *Id.* ¶ 15.

{31} In this case, the metropolitan court judge was unsure whether the State's sole witness could be deemed an appropriately qualified witness as contemplated by *Garza*. As discussed above in more detail, the officer's testimony revealed that he had only the most basic knowledge concerning testing procedures and no knowledge about the SLD certification process. Even as to the "certification card" attached to the machine, the officer could only say that it was a replica of an actual certificate. He could not say who signed it, when it was signed, or who attached the replica to the machine.

{32} The SLD regulations impose minimum specific requirements for initial and renewed certifications of breath alcohol test-

**2.** Interestingly, Defendant could only make his motion in this case during trial. As such, we view the timing issues here as neutral favoring neither party. Further, we see no evidence that the State was simply honing its trial strategies.

ing instruments. 7.33.2.11 NMAC (2001). All machines "must be certified by SLD prior to placement and use in the field." 7.33.2.11(D) NMAC. Each machine must be returned to SLD on an annual basis for an inspection, which includes running analysis of "[a] series of controlled ethyl alcohol solutions" with a defined accuracy requirement. 7.33.2.11(E)(3) NMAC. Without belaboring the point, the regulation also prescribes a number of ongoing reports which must be sent to SLD, a periodic "proficiency testing" regimen and calibration checks once every seven days. 7.33.2.11(G)(2) NMAC. Finally, the regulation requires recertification of any machine moved from an "SLD-approved" site and further requires advance approval for "[a]ny modifications of an SLD-approved field site." 7.33.2.11(D) NMAC.

{33} It is clear that the purpose of these regulations is to establish a quality assurance/quality control regime to assure test reliability for evidentiary purposes. In fact, the certification regulations can be viewed as the root procedure upon which subsequent assurances of accuracy depend. That is, a machine inspected and measured for accuracy should be reasonably relied upon to produce results of evidentiary quality in the field so long as follow-up procedures are followed and the machine is used in the environment in which the SLD approves and the SLD-approved environment in which SLD expects the machine to be used. Absent reasonable proof of compliance with the certification regulations the assurances as to the machine's reliability are necessarily suspect.

{34} Our Supreme Court has agreed "that if an accuracy-ensuring [SLD] regulation is not satisfied, the result of the test in question may be deemed unreliable and excluded." *State v. Dedman*, 2004–NMSC–037, ¶ 13, 136 N.M. 561, 102 P.3d 628 (citing *Onsurez*, 2002–NMCA–082, 132 N.M. 485, 51 P.3d 528 and *State v. Gardner*, 1998–NMCA–160, 126 N.M. 125, 967 P.2d 465 as examples of regulations going to accuracy). As to what foundational requirements are required to demonstrate compliance with SLD certification regulations, we will not attempt to provide a global answer because that would inevitably lead us to the arena of advisory opinions. *See State v. Wyrostek*, 117 N.M. 514, 523, 873 P.2d 260, 269 (1994) (holding that the Supreme Court will not issue advisory opinion on issue not before the court). Our resolution of this case will however provide some guidance for future cases.

{35} The State urges us to apply the approach we adopted in cases such as *State v. Ruiz*, 120 N.M. 534, 539, 903 P.2d 845, 850 (Ct.App.1995) and *State v. Smith*, 1999–NMCA–154, ¶ 13, 128 N.M. 467, 994 P.2d 47, in which we stated, perhaps overbroadly, that all that was needed to lay a proper foundation for a BAT result was "the live testimony of the officer who administered the test as to his familiarity with the testing procedure, the recent calibration of the machine, and his observation that the test administration proceeded without error." *Smith*, 1999–NMCA–154, ¶ 13, 128 N.M. 467, 994 P.2d 47. We decline to do so. These cases are distinguishable and they do not adequately reflect the importance of demonstrating compliance with SLD regulations.

{36} For example, the evidence available to the Court in *Ruiz* was different and much more complete than the record reflects here. In *Ruiz*, the defense objected that the arresting and testing officer was not qualified to testify that the machine was properly calibrated. In response, the State called another employee whose job was to perform weekly calibration tests on the machine. 120 N.M. at 535–36, 903 P.2d at 846–47. This employee adequately explained the calibration procedure and provided a proper foundation to have the weekly calibration logs admitted as a business record under Rule 11–803(F) NMRA. This was the evidentiary context which allowed us to assert that the officer's testimony "validated" the BAT results. We have no evidence in this case other than the officer's testimony and the officer had no information or knowledge as to certification of the machine other than that he saw a replica of a certification card. That is simply not enough.

{37} *Smith* is closer on its facts to this case. In *Smith*, the State presented only the arresting/testing officer's testimony. The trial court admitted the BAT result over a

defense objection that the officer "was not the custodian of the machine's calibration records and that the State had failed to adduce evidence regarding the machine's calibration." 1999–NMCA–154, ¶ 7, 128 N.M. 467, 994 P.2d 47. We affirmed, emphasizing that the officer was very experienced having administered 2000 to 3000 tests; the officer was able to testify specifically that there was a test/calibration log attached to the machine and that it indicated the machine had been calibrated within the time required by SLD regulations; and the officer could explain how the machine performed its self-calibration upon start-up. In short, the officer displayed sufficient personal knowledge based on documentation about the challenged issue—calibration—to support a finding that accepting his testimony to support admission of the BAT was not an abuse of discretion. In contrast, the officer in this case displayed no knowledge of or experience in the challenged issue—certification.

{38} In this sense, our case is closer in factual posture to our decision in *Bransford v. State Taxation & Revenue Department,* 1998–NMCA–077, ¶¶ 3–12, 125 N.M. 285, 960 P.2d 827, in particular the first portion of the case discussing appellant Jaramillo. In Jaramillo's administrative hearing, the officer could not testify whether the machine had been recently calibrated, how the log book demonstrated calibration, or how the machine performed its self-test on start-up. We noted that this testimony—consisting essentially of unexplained raw data—failed to provide "any direct evidence of calibration," and therefore the BAT results were admitted in error. *Id.* ¶¶ 6–9. Officer Tixier's testimony here similarly provided no direct (or even indirect) evidence of certification.

{39} In *Onsurez,* we noted that the foundational requirements—or formulation—stated in cases such as *Ruiz* and *Smith* "remain viable, but the [SLD] regulations require more." *Onsurez,* 2002–NMCA–082, ¶ 13, 132 N.M. 485, 51 P.3d 528. Through this statement we recognized and reiterated the statutory mandate to require proof of compliance with SLD regulations addressing accuracy in test results. In *Onsurez,* we also recognized that the shorthand formulation of testimony, which might be deemed adequate in cases such as *Ruiz* and *Smith,* was not sufficient to cover proof of certification. We reiterate that position here. Upon proper challenge to certification, the State will be required to provide a reasonable quantum of direct admissible evidence going to the issue. Testimony that "a certificate was attached" and the "machine seemed to work properly" is not enough.

{40} Finally, the State asserts that a ruling in Defendant's favor will eviscerate Metropolitan Court of Criminal Procedure 7–607. We disagree. The Rule applies only to cases in which there is a trial de novo. As noted above, no DWI trial in metropolitan court is subject to a trial de novo on appeal. Thus, the Rule as currently structured simply does not apply to this case.

{41} The district court is reversed.

{42} **IT IS SO ORDERED.**

I CONCUR: RODERICK T. KENNEDY, Judge.

IRA ROBINSON, Judge, specially concurring.

ROBINSON, Judge (specially concurring).

{43} New Mexico has a serious problem with drunk drivers that are causing havoc in our state. This case tells us something about what is wrong with the way this problem is being handled at the trial stage.

{44} Here is how I see it. The district attorney charged Defendant with driving while intoxicated, charging a violation of Section 66–8–102. In relevant part, it states:

66–8–102. **Persons under the influence of intoxicating liquor or drugs; aggravated driving while under the influence of intoxicating liquor or drugs; penalty.**

A. It is unlawful for a person who is under the influence of intoxicating liquor to drive a vehicle within this state.

B. It is unlawful for a person who is under the influence of any drug to a degree that renders him incapable of safely driving a vehicle to drive a vehicle within this state.

C. It is unlawful for:

(1) a person who has an alcohol concentration of eight one hundredths or more in his blood or breath to drive a vehicle within this state; or

(2) a person who has an alcohol concentration of four one hundredths or more in his blood or breath to drive a commercial motor vehicle within this state.

Under this section of our DWI laws, the district attorney has two different ways to show that the accused was intoxicated while operating his vehicle: (1) under Section 66–8–102(C)(1), he can present proof that the driver had a breathalyzer test result of .08 or more; or (2) under Section 66–8–102(A), he can show that the driver was "under the influence of intoxicating liquor" while operating his vehicle. For example, he can do this by presenting proof of the physical status of the driver, showing that the driver had bloodshot, watery eyes, had slurred speech, and his breath smelled of alcohol. He can also present testimony about the field sobriety tests. He can show whether the driver was stumbling or walking steadily. He can also show whether the driver admitted drinking alcoholic beverages at the time of the incident.

{45} A district attorney who charges a violation of the entire Section 66–8–102 is not limited to subsection C. If he cannot prove the breath alcohol test result was at least .08, he is still free to prove the defendant was "under the influence" under subsection A. What happened in this case is that the breathalyzer test results were not valid because the reliability of the breathalyzer machine was not established. That was a proper holding by the metropolitan court and by this Court. With that, I do not disagree. The trial judge correctly suppressed the breath alcohol test results, but he should not have acquitted Defendant or dismissed the charges.

{46} The district attorney still had his other option to convict and he had already presented sufficient evidence to prove that Defendant was under the influence of intoxicating liquor. In *State v. Dutchover*, 85 N.M. 72, 73, 509 P.2d 264, 265 (Ct.App.1973),

this Court explained that "[u]nder the influence means that to the *slightest degree* [the] defendant was less able, either mentally or physically, or both, to exercise the clear judgment and steady hand necessary to handle an automobile with safety to himself and the public." (internal quotation marks and citation omitted) (emphasis added). The trial judge, in spoken comments, expressed doubt that, without the BAT results, he had sufficient evidence to rule that Defendant was nevertheless still guilty of DWI. The trial judge was wrong. *See State v. Gutierrez*, 1996–NMCA–001, 121 N.M. 191, 909 P.2d 751. In *Gutierrez*, this Court upheld a DWI conviction based on behavior evidence alone and stated that the defendant "was not convicted of having a particular blood-alcohol level," but was "convicted of the more general offense of driving while intoxicated." *Id.* ¶ 4. In that particular case, the defendant smelled of alcohol, had bloodshot eyes, failed field sobriety tests, and admitted to drinking alcohol. *Id.* In addition, there was evidence that the defendant's vehicle was weaving into other traffic lanes. *Id.* This Court held that even if the BAT card results had not been admissible, the defendant's DWI conviction, under Section 66–8–102(A), was fully supported by the "overwhelming" behavior evidence. *Id.*

{47} Let us examine the evidence here. Officer Tixier, the arresting officer, testified that Defendant was driving at night with his taillights off. Defendant had "extremely" watery eyes and was unsteady in getting out of his vehicle. He had a strong odor of alcohol on his breath; and, more importantly, Defendant admitted he had "a few beers" and a "Bacardi." What's more, Officer Tixier also testified that Defendant performed poorly on the field sobriety tests he administered to Defendant.

{48} If there was case law that said a driver could be convicted only upon a showing of "extreme," or "great" impairment, I could understand how the trial judge could have had some doubt about Defendant's guilt, but, under the facts of this case, I cannot understand how the judge could have reasonable doubt about impairment to the slightest degree. Unfortunately, the district

attorney did not request the trial judge to find Defendant guilty based upon this evidence; he failed to preserve this issue on appeal. This Court cannot repair what has been irreparably broken.

{49} As an added observation, the trial judge should not have dismissed the charge concerning driving without lights just because the breath alcohol test result was unreliable. That evidence rises or falls on its own merits. Here, there was uncontroverted evidence that Defendant was driving with his lights off at night, which is a violation of law separate from DWI.