This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

   Plaintiff-Appellee,

v.                                                    NO. 34,170

**MARIAH SANCHEZ,**

   Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Benjamin Chavez, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Jacqueline R. Medina, Assistant Attorney General
Albuquerque, NM

for Appellee

Jorge A. Alvarado, Chief Public Defender
Santa Fe, NM
Steven J. Forsberg, Assistant Appellate Defender
Albuquerque, NM

for Appellant

## MEMORANDUM OPINION

**HANISEE, Judge.**

{1} Defendant appeals her convictions for following too closely in violation of NMSA 1978, Section 66-7-318 (1978) and driving under the influence of intoxicating liquor or drugs in violation of NMSA 1978, Section 66-8-102 (2010), arguing that Section 66-7-318 is unconstitutionally vague and that the metropolitan court should have suppressed the State's evidence. We affirm.

**BACKGROUND**

{2} In the early morning hours of May 19, 2012, an Albuquerque police officer observed Defendant traveling north on Broadway towards Lomas about one car length behind a motorcycle. The officer later explained that he knew from driving school and his own experience as a driver that it takes three to five seconds to bring a vehicle to a complete stop. The officer concluded that Defendant's proximity to the motorcycle in front of her was neither "prudent" nor "reasonable" because she would have less than one second to come to a complete stop if required. On cross-examination, the officer testified that he did not remember whether the light Defendant had been approaching was green or red and that Defendant had been traveling twenty to twenty-five miles per hour before he initiated a traffic stop.

{3} Defendant moved the district court to suppress the State's evidence against her because the police officer did not have reasonable suspicion to believe that she had violated Section 66-7-318 when he initiated the traffic stop. Defendant based her

2

argument on the officer's testimony that he did not recall whether the traffic light Defendant was driving toward was red and inconsistency between his trial testimony and statements at his pretrial interview with respect to how long he observed Defendant before pulling her over. The district court denied Defendant's motion, concluding that the officer's testimony established that reasonable suspicion existed to conclude that Defendant had violated Section 66-7-318 and to initiate a traffic stop to investigate.

{4}    After citing Defendant for following too closely behind the motorcycle, the police officer noticed that Defendant smelled of alcohol and had bloodshot, watery eyes. Defendant admitted to drinking one "very large beer." Defendant failed various field sobriety tests, after which she consented to submitting samples of her breath for testing in a Breathalyzer. At trial, however, Defendant objected to the admission of the results of the breath tests, arguing that the State had failed to establish a proper evidentiary foundation for their admission. The district court admitted into evidence the results of those tests, which indicated that Defendant had a blood alcohol content of .10 and .09. The district court adjudicated Defendant guilty of driving while intoxicated in violation of 66-8-102 and following too closely in violation of Section 66-7-318. This appeal followed.

**DISCUSSION**

{5} Defendant raises three issues on appeal: (1) Section 66-7-318 is unconstitutionally vague; (2) the police officer did not have reasonable suspicion that Defendant had violated Section 66-7-318; and (3) the district court abused its discretion in admitting the results of the breath tests administered to Defendant because the State failed to provide evidence that the equipment used to perform the testing was approved by the Scientific Laboratory Division of the State Department of Health (SLD), as required by 7.33.2.15(B)(1) NMAC.

**1. Section 66-7-318 Is Not Unconstitutionally Vague Because it Gives Fair Notice of the Conduct it Prohibits and Does Not Allow or Encourage Ad Hoc Application**

{6} "[A] statute denies constitutional due process if it is so vague that persons of common intelligence must necessarily guess at its meaning." *State v. Aranda*, 1980-NMCA-130, ¶ 11, 94 N.M. 784, 617 P.2d 173. When a Defendant contends that a statute is unconstitutionally vague, "[w]e review the challenge . . . in light of the facts of the case and the conduct which is prohibited by the statute." *State v. Laguna*, 1999-NMCA-152, ¶ 24, 128 N.M. 345, 992 P.2d 896 (internal quotation marks and citation omitted). Furthermore, we presume that a duly-enacted statute is constitutional and assign to the party challenging its validity the burden of persuasion. *Id.*

{7} A statute is unconstitutionally vague if "(1) it fails to provide persons of ordinary intelligence using ordinary common sense a fair opportunity to determine

4

whether their conduct is prohibited; or (2) it fails to create minimum guidelines for the reasonable police officer, prosecutor, judge, or jury charged with enforcement of the statute, and thereby encourages subjective and ad hoc application." *State v. Jacquez*, 2009-NMCA-124, ¶ 6, 147 N.M. 313, 222 P.3d 685.

{8}     The relevant provision of our following too closely statute requires that "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." Section 66-7-318(A). Defendant argues that the absence of any objective definition of "prudent" or "reasonable" in Section 66-7-318 means that the statute fails to provide ordinary drivers with a fair sense of whether or not following a given distance behind another motorist is prohibited by the statute.

{9}     We disagree. As the Tenth Circuit Court of Appeals noted when considering a void-for-vagueness challenge to an identically worded Kansas statute, "general statements of the law are not inherently incapable of giving fair and clear warning." *United States v. Hunter*, 663 F.3d 1136, 1141 (10th Cir. 2011) (internal quotation marks and citation omitted). Simply because a statute incorporates normative standards of conduct like reasonableness and prudence does not automatically render the statute unconstitutionally vague. *Id.* at 1142. Defendant concedes that point, but

5

nonetheless contends that some additional definition of those terms is required in this case; otherwise, Defendant predicts that Section 66-7-318 will be enforced according to arbitrary standards such as whether or not a given following distance is "polite" or simply not so close as to cause injuries in the event of a collision. But Section 66-7-318(A) allays these concerns by providing that motorists exercise "due regard" to the speed of the vehicle being followed and the condition of the highway in determining what is prudent and reasonable. *Id.* If a highway is icy, then a reasonable and prudent distance might be several hundred feet. Conversely, tailing another car by a few yards may be reasonable and prudent in the parking lot of a sports arena. Section 66-7-318(A)'s mention of the speed of the followed driver and the condition of the roadway thus reinforces our conclusion that an ordinary driver will intuitively understand what a reasonable and prudent following distance is in a given situation.

{10} Defendant next argues that Section 66-7-318 invites ad hoc application because it does not provide any objective basis for determining the correct following distance. As evidence of the possibility of inconsistent enforcement, Defendant contrasts the police officer's testimony in this case that he measured a safe following distance in seconds with the prosecution's statements at oral argument that a safe following distance is to be measured by car lengths. But the ability to explain reasonable and prudent following distance in terms of seconds, car lengths, a variable ratio between

6

speed and distance, or even the likelihood that the followed driver will be offended and angry simply reinforces the point made above: Section 66-7-318's use of the terms "reasonable" and "prudent" acknowledges the uncontroversial notion that lawful and safe driving may depend on context, and thus a certain measure of flexibility is necessary to ensure public safety and uniform enforcement of traffic rules. *See Hunter*, 663 F.3d at 1142 ("With respect to the statute in question, we must also keep in mind that this is a misdemeanor traffic regulation statute, enacted for the safety of the driving public."); *see also* NMSA 1978, § 66-8-116 (2011, amended 2014) (imposing a $10 fine for violations of Section 66-7-318). This flexibility (and any attendant ambiguity that entails) does not overcome the presumption that Section 66-7-318 is constitutional.

**2.     The Police Officer's Stop of Defendant Was Supported by Reasonable Suspicion**

{11}     "Police may make an investigatory stop in circumstances that do not rise to the level of probable cause for an arrest if the officers have a reasonable suspicion that the law has been or is being violated." *State v. Sanchez*, 2005-NMCA-081, ¶ 11, 137 N.M. 759, 114 P.3d 1075. "Since an automobile stop is considered a seizure under the Fourth and Fourteenth Amendments, it must be conducted in a reasonable manner to satisfy the Fourth Amendment." *State v. Hubble*, 2009-NMSC-014, ¶ 7, 146 N.M. 70, 206 P.3d 579 (internal quotation marks and citation omitted). Therefore, "[b]efore a

police officer makes a traffic stop, he must have a reasonable suspicion of illegal activity." *Id.* (internal quotation marks and citation omitted). "A reasonable suspicion is a particularized suspicion, based on all the circumstances that a particular individual, the one detained, is breaking, or has broken, the law." *State v. Jason L.*, 2000-NMSC-018, ¶ 20, 129 N.M. 119, 2 P.3d 856. Our appellate courts "will find reasonable suspicion if the officer is aware of specific articulable facts, together with rational inferences from those facts, that, when judged objectively, would lead a reasonable person to believe criminal activity occurred or was occurring." *Hubble*, 2009-NMSC-014, ¶ 8 (internal quotation marks and citation omitted).

{12} Our review of the district court's order denying Defendant's motion to suppress presents a mixed question of fact and law. *State v. Funderburg*, 2008-NMSC-026, ¶ 10, 144 N.M. 37, 183 P.3d 922. "We review factual determinations for substantial evidence and legal determinations de novo." *State v. Ketelson*, 2011-NMSC-023, ¶ 9, 150 N.M. 137, 257 P.3d 957. Where, as here, the district court did not set out its findings of fact and conclusions of law, we will draw all reasonable inferences from the facts in favor of the district court's ruling. *Funderburg*, 2008-NMSC-026, ¶ 10.

{13} Defendant makes two arguments that the police officer had no reasonable suspicion that Defendant had violated Section 66-7-318. First, Defendant contends that the undisputed testimony of the police officer established that there were no other

8

cars on the road aside from the motorcycle Defendant was following. Defendant suggests that even if she was following only one car length behind the motorcyclist in front of her, the absence of any other cars on the roadway meant that she could have changed into an adjacent lane in order to avoid colliding with the motorcycle if it came to a sudden stop. The unstated premise of Defendant's argument is that Section 66-7-318 only applies when swerving out of the way is not possible. Defendant cites the New Mexico Driver Manual, a publication of the New Mexico Motor Vehicle Division of the Taxation & Revenue Department, in support of this contention. The Manual states that "[b]y slowing down or changing lanes, you may not have to stop at all[.]"[1] N.M. Motor Vehicle Dep't, *English Driver's Manual*, at 15, *available at* http://mvd.newmexico.gov/mvd-procedures-manuals.aspx. Even assuming the MVD's interpretation of prudent and reasonable driving controls this Court's interpretation of Section 66-7-318, the section of the manual quoted by Defendant is the Department's advice for motorists to "avoid panic stops by seeing events well in advance." N.M. Motor Vehicle Dep't, *supra*, at 15. In other words, it advocates

---

[1]Defendant provides a worldwide web URI for the manual, but following it yields a 'page not found' error. The Court found what appears to be the source cited in Defendant's brief in chief at the following URI: http://www.mvd.newmexico.gov/resources-forms-information-drivers.aspx (follow "MVD Driver's License Manuals" link). Counsel are reminded that when citing to internet sources, "[a]ll efforts should be made to cite to the most stable electronic location available." *The Bluebook: A Uniform System of Citation* R.18.2.2 at 182 (Columbia Law Review Ass'n et al. eds., 20th ed. 2015).

slowing down and switching lanes in order to avoid following too closely (and thus being forced to "panic stop" often), not that following too closely is permissible whenever it is possible to switch lanes or slow down without causing an accident.

{14}   Defendant next argues that the officer did not have reasonable suspicion to conclude that she had violated Section 66-7-318 because the officer "was unable to testify that [Defendant's] car was not slowing or that she did not already have her foot on the brake for quick response" and could not recall whether the traffic light at the intersection Defendant was driving toward was red. But an officer need not possess irrefutable proof of wrongdoing in order to have reasonable suspicion that a crime has been committed; rather, the officer only needs "a particularized suspicion, based on all the circumstances[.]" *Jason L.*, 2000-NMSC-018, ¶ 20. Here, the officer's testimony that he saw Defendant driving a single car length behind a motorcycle while traveling twenty-five miles per hour, which the district court credited, was sufficient to support "rational inferences . . . [that] would lead a reasonable person to believe" Defendant had violated Section 66-7-318(A). *See Hubble*, 2009-NMSC-014, ¶ 8.

**3.     The District Court Did Not Abuse Its Discretion in Admitting the Results of Defendant's Breath Alcohol Content Test**

{15}   Defendant finally argues that the district court abused its discretion in admitting the results of Defendant's breath test because the State failed to provide evidence that the gas canister attached to the breath testing machine used by the police officer to test

10

Defendant's blood alcohol content was approved by the SLD, as required by regulations adopted by the SLD under its statutory authority over the administration of breath and blood tests to persons suspected of driving under the influence of intoxicants. *See* NMSA 1978, § 24-1-22 (2003); *see also* 7.33.2.15(B)(1) NMAC ("Samples of the subject's breath shall be collected and analyzed pursuant to the procedures prescribed by SLD and employing only SLD approved equipment and certified instruments."). As Defendant acknowledges, this argument was raised and briefed in *State v. Hobbs*, ___-NMCA-___, ___ P.3d ___ (No. 33,715, Dec. 22, 2015), *cert. denied* 2016-NMCERT-___ (No. 35,708, Feb. 15, 2016).[2] In *Hobbs*, which this Court decided after the parties finished briefing this case, we rejected the defendant's argument that SLD rules require a testifying officer to be aware of SLD approval of a gas canister attached to a breath test machine in addition to SLD's certification of the machine itself. *Id.* ¶¶ 19-22. Finding no basis to distinguish *Hobbs*, we reject Defendant's argument summarily.

**CONCLUSION**

---

[2]By special concurrence, Judge Kennedy states his displeasure with our reliance on *Hobbs*, and with *Hobbs* itself. But our decision in *Hobbs* not only resolves the issue before us, it was considered and left undisturbed by our Supreme Court. "Stare decisis is the judicial obligation to follow precedent, and it lies at the very core of the judicial process of interpreting and announcing law." *Trujillo v. City of Albuquerque*, 1998-NMSC-031, ¶ 33, 125 N.M. 721, 965 P.2d 305. We choose not to substantively address Judge Kennedy's disagreement with established and directly applicable New Mexico law.

{16}     We affirm the district court's order denying Defendant's motion to suppress and its admission of the results of Defendant's breath test into evidence. We reject Defendant's challenge to the constitutionality of Section 66-7-318.

{17}     **IT IS SO ORDERED.**

_____
**J. MILES HANISEE, Judge**

**I CONCUR:**

_____
**LINDA M. VANZI, Judge**

**RODERICK T. KENNEDY, Judge (specially concurring)**.

**KENNEDY, J., specially concurring.**

{18} I have no quarrel with the adequacy of reasonable suspicion employed to effect a traffic stop of Defendant. Nor do I have a quibble with the absence of vagary in the following too closely statute. I do quarrel with the calibration of the majority's analysis employed in discussing the admissibility of the breath test. Myth has it that in antiquity, maps demonstrated uncharted territory with pictures of grotesque beasts and the legend "*hic sunt dracones*"—"Here be dragons." I respectfully assert that the majority's citation to *Hobbs* in this case, advances no necessary point to the decision, and begs an unfortunate foray into terra incognita. *See* Majority Op. ¶ 15. I simply believe that *Hobbs* demonstrates a material misunderstanding of what makes for "accuracy-ensuring" SLD regulations with regard to dry-gas calibration of breath test devices that precludes my agreement to use it as precedent here.

**The District Court Ruled Using That Approved Equipment Was Accuracy-Ensuring**

{19} This discussion on my part is necessary here because, unmentioned and unreversed by the majority opinion, the district court specifically and correctly ruled that the requirement to use SLD-approved equipment under 7.33.2.15(B)(1) NMAC, was an accuracy-ensuring regulation and that the State was required to demonstrate compliance with it as part of its foundation for adjudication of Defendant's test result. I agree with the district court; thus, to rely on *Hobbs* means the district court was

wrong in its holding, a point unstated in the majority opinion. I believe I should attempt to show why the district court was right for the right reasons.

**Affirmance Here Is Right For the Wrong Reasons**

{20}    The majority's reliance on *Hobbs* is unnecessary here because the metropolitan court's ruling (and district court's affirmance) was right without going off the map to answer unasked questions. In the trial, the metropolitan court asked for specific objections to the admission of the breath test result. Defendant propounded no objection other than an assertion, based on the officer's testimony, that it was unknown whether the cylinder containing the dry-gas standard by which the test device is calibrated had always been on the device used to test Defendant. Having neglected to establish by any evidence that moving the canister would have any effect at all on the breath test, the objection was essentially unfounded, and the metropolitan court properly denied the objection. The metropolitan court admitted the test result pursuant to *State v. Martinez*, 2007-NMSC-025, 141 N.M. 713, 160 P.3d 894, mentioning that if the machine is certified and in apparent working order, the whole machine is certified, and the attached cylinder was supported by the hearsay about its certification from the laboratory. I find no error in that ruling and would not have written separately save for the reference to *Hobbs*.

14

{21} Interestingly, but germane to the point I feel I must make, the metropolitan court mentioned that it had earlier suppressed a breath test in another case when records produced at trial demonstrated that the calibration standard canister had expired. No other elements of proper foundation for the breath test were asserted to be lacking under *Martinez*, and the metropolitan court noting such, the test result was admitted. Because the metropolitan court's ruling was correct under *Martinez*, the majority had no need to rely on *Hobbs*.

**Why Calibration Is So Important: Machine Certification Depends on It**

{22} In *State v. King*, we held that "[c]ompliance with the SLD regulations intended to ensure accuracy is a predicate to admission in evidence of test results." 2012-NMCA-119, ¶ 10, 291 P.3d 160. "[C]ertification" is requisite, but *Martinez* held that showing the machine "has been certified is not enough," but that "the State must also make a threshold showing that SLD certification was current at the time the test was taken." 2007-NMSC-025, ¶ 12 (internal quotation marks and citation omitted). *Martinez* was clear in reiterating *State v. Dedman's* rule that "to meet foundational requirements, the State does not need to show compliance with all regulations, but only with those that are " 'accuracy-ensuring.' " *Martinez*, 2007-NMSC-005, ¶ 11 (quoting *State v. Dedman*, 2004-NMSC-037,¶ 13, 136 N.M. 561, 102 P.3d 628, *overruled on other grounds by State v. Bullcoming*, 2010-NMSC-007, 147 N.M. 487,

226 P.3d 1)). Regardless, our courts frequently gloss over the fact that certification explicitly depends on compliance with regulations directed at making sure a breath test device is capable of producing an accurate result, including rigorous requirements concerning calibration. *See State v. Onsurez*, 2002-NMCA-082, ¶ 13, 132 N.M. 485, 51 P.3d 528 ("[W]eekly calibration is only one of the requirements for certification[.]"); *see also Martinez*, 2007-NMSC-025, ¶ 11 ("Certification is also contingent upon: (1) monthly submission of records pertaining to all tests conducted on the machine, (2) satisfactory performance of six yearly proficiency samples, and (3) a calibration check at least every seven days and/or a .08 calibration check conducted on each subject."). Thus, a showing of "current certification" depends on a demonstration that the accuracy-ensuring contingencies of the regulations were fulfilled prior to the test being administered. *Martinez*, 20007-NMSC-025, ¶ 12; *State v. Willie*, 2009-NMSC-037, ¶ 8, 146 N.M. 481, 212 P.3d 369 (noting that *Martinez'* holding "that 'accuracy-ensuring' regulations governing the admission of breath alcohol tests are foundational requirements governed by Rule 11-104(A) [NMRA] and, therefore, the trial court must be satisfied by a preponderance of the evidence that those regulations have been followed prior to admitting the BrAT results"). The penalty for failing to prove adequate calibration upon objection is exclusion of the test. *Onsurez,* 2002-NMCA-082, ¶ 13; *see also Dedman*, 2004-NMSC-037, ¶ 13

(stating that "if an accuracy-ensuring regulation is not satisfied, the result of the test in question may be deemed unreliable and excluded").

**Calibration Can Be Shown by Reference to Log Books and Required Documents**

{23} *Martinez* states that calibration checks "clearly exist to ensure that the result of a test conducted on a breathalyser is accurate." 2007-NMSC-025, ¶ 12. With dry-gas calibration, a calibration check shall be performed with every test that is performed, rather than a weekly calibration using a wet-bath simulator, 7.33.2.14(C)(2)(b)(i), (ii) NMAC. In *Martinez*, calibration was demonstrated by the officer's experience and that the machine's log indicated calibration within the requisite period to allow continued certification. *Id.* ¶ 21. The content of the document showing calibration is what is important, not the officer's knowledge of the underlying process. *Id*. ¶ 22. In *Hobbs*, the officer did not know the "make, model, or serial number of the canister used" in the defendant's test, yet the trial court accepted as sufficient foundation that he learned eight months after the stop that "the gas canisters used on the machine were the same make and model as those listed in the SLD regulations." *Hobbs*, 2015-NMAC-___, ___ P.3d ___, ¶ 6. Such acceptance strains credulity beyond acceptable limits.

**Calibration Requires Traceability to a Known Sample Value**

17

{24}    Calibration must be accomplished according to strict standards, and using a reference standard of a particular value. A "[c]alibration check" is "[t]he analysis of an externally delivered, controlled, ethanol vapor specimen of known alcohol concentration. SLD shall determine the breath alcohol simulator solutions or gases to be used." 7.33.2.7(I) NMAC. The standard for the gas used in calibration checks that are, as here performed "with each subject test[,]" requires the gas within to "simulate 0.08 grams per 210 liters" and give results "within ±0.01." 7.33.2.14(C)(2)(b)(ii) NMAC. The essence of calibration is requiring the machine establish a baseline reading with a reference sample of a certified or traceable (i.e., "known") standard sample.[3] This standard (here a "standard" is a reference sample gas that contains a known alcohol concentration) is provided by the contents of the dry gas cylinder to fulfill the requirement of a "calibration check using SLD approved . . . gases." 7.33.2.14(C)(2)(b) NMAC. To repeat: A calibration check requires an "analysis of an externally delivered, controlled ethanol vapor specimen of *known alcohol concentration* [(0.08 g/201L)]." 7.33.2.7(I) NMAC (emphasis added). As the established value against which the unknown sample of the subject's breath is tested,

---

[3] E.g., "Calibration" means the activity of verifying that a value generated by the instrument is in acceptable agreement with the assigned value for a traceable and/or certified reference standard, including any adjustment to the instrument to bring it into acceptable agreement," 10 N.Y. ADC 59.1, 10 N.Y. Comp. Codes R. & Regs. tit. 10, § 59.1 (2016).

calibration using the required standard is the very anchor for the accuracy of the analytical process, ensuring that the eventual measured result of the breath sample represents what it purports to[4]. In other words, the sample value must be *traceable* in its quantitative relationship to the known sample by which the device was calibrated. The sum of this occurs, in the plain language of *Martinez,* so that the purpose of the calibration check is ultimately "to ensure that the result of a test conducted on a breathalyser is accurate." *Id.* 2007-NMSC-025, ¶ 12.

**There Is No Reference Standard if It Doesn't Come From an Approved Canister**

{25}     In this case and *Hobbs*, the standard comes from a canister. *Hobbs* shucks off the importance of the canister by calling it "equipment," but "[e]quipment" is a device that "assist[s] in meeting the requirements of an evidentiary breath test[,]" *Id.*; 7.33.2.7(L) NMAC. Here, it assists in meeting the requirement of providing the required reference sample. In the cascading nature of the accuracy-ensuring regulations mentioned earlier, I now stop to point out that the canister cannot be approved unless it contains an approved reference sample that fulfills the calibration regulations for the contents of a reference standard. "Equipment" may be a tank, but the tank's contents (the "SLD approved gases"/reference standards mentioned above)

---

[4] Ted Vosk and Ashley F. Emery, *Forensic Metrology: Scientific Measurement and Inference for Lawyers, Judges, and Criminalists*: *Metrological Traceablity,* § 3.4, at 80 (2015).

19

are the essence of the machine's calibration under subsection 7.33.14(C)(2)(b)(ii) NMAC, as well as being the basis for approval of the tank itself. SLD approves for use "[a]ll tanks, which are compatible with the Intoxilyzer 8000, containing an approved reference standard," and lists four specific "Approved Reference Standards" of the required alcohol content allowed to be contained therein to be used for calibration of evidential breath test machines. N.M. Dep't of Health, Sci. Lab. Div., List of Approved Breath & Blood Alcohol Testing or Collection Devices & Accessories, http://nmhealth.org/publication/view/general/1537 (last updated 4/2/2014). *Hobbs* also got the import of "approval" wrong. Approval of the tank is valid only so long as the approved reference standard within meets the content and concentration specifications of the regulations quoted above.

{26}     So in this case, I believe the district court got the science, and its underlying requirement of good measurement traceable to known standards spot-on. It is the very scientific integrity of the breath test that depends on the requirement to use SLD-approved equipment under 7.33.2.15(B)(1). Accordingly the regulation is unequivocally accuracy-ensuring and one with which the State was required to demonstrate compliance as part of its foundation for Defendant's test.

{27}     Ongoing breath test certification depends on those things that ensure the accuracy of the tests it produces. The critical warrant of accuracy is provided by

20

calibration. Descending the cascade here shows the dependency on annual certification on periodic accuracy-ensuring procedures, especially calibration. Calibration is easily demonstrated to depend on valid calibration practice, particularly requirements for the use of certified and approved reference standards which can only be delivered in approved containers. Having descended, it should be no problem to ascend to a realization that compliance with these regulations is essential to a breath test's accuracy. Dry-gas canisters are of relatively new vintage for calibrating breath test devices, and in many cases, as here, the defense inquiry into the basis for a test result is perfunctory. Perhaps discovery showed nothing amiss in the chain of requirements for certification; perhaps no preparation was done at all. Either way, a lack of understanding of this corner of what is "accuracy ensuring" creates mythology, such as is afoot in *Hobbs*.

{28} Only an understanding of the process of scientific measurement can debunk mythology, which should not be judicially urged past the edge of the map to where there might be dragons. This is likely not the case to take up the *Hobbs*' unfortunate myth that equipment is not part of an accuracy-ensuring regulation, because *Hobbs* had been embraced by the our Supreme Court, and is in fact irrelevant to the correct ruling herein. However, in this case the district court had the message, should be commended, and perhaps soon a properly presented case may present the necessarily

complete picture to address *Hobbs*, and ensure due process with regard to scientific evidence.

_____
**RODERICK T. KENNEDY, Judge**